# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| ANNELIESE RUNDLE, MARTHA BENDER, and KATHERINE GUY,<br><br>　　　　　　Plaintiffs,<br><br>vs.<br><br>DEPUY ORTHOPAEDICS, INC. and PRECISION INSTRUMENTS, INC.<br><br>　　　　　　Defendants. | Case No.  2:11-cv-00634-PMP-GWF<br><br>**ORDER Re:  Defendants' Motion to Stay - #6**<br><br>**FINDINGS AND RECOMMENDATION Re:**<br><br>**Plaintiffs' Motion to Remand - #5** |

　　　This matter is before the Court on Defendants DePuy Orthopedics, Inc. and Precision Instruments, Inc.'s Motion to Stay Pending Transfer to MDL No. 2197 - *In Re DePuy Orthopedics, Inc., ASR Hip Implant Products Liability Litigation* (#6), filed on April 27, 2011; Plaintiffs' Opposition to Motion to Stay (#10), filed on May 1, 2011; and Defendants' Reply in Support of Motion to Stay (#14), filed on May 11, 2011.  The Court conducted a hearing on this motion on May 27, 2011.

　　　Also before the Court is Plaintiffs' Motion for Remand (#5), filed on April 26, 2011; Defendants' Opposition to Plaintiffs' Motion for Remand (#15), filed on May 13, 2011; and Plaintiffs' Reply in Support of Motion for Remand (#17), filed on May 20, 2011.  The Court conducted a hearing on this motion on July 6, 2011.

### FACTUAL AND PROCEDURAL BACKGROUND

　　　Plaintiffs Anneliese Rundle, Martha Bender and Katherine Guy filed their Complaint against Defendants DePuy Orthopedics, Inc. and Precision Instruments, Inc. in the Nevada District Court, Clark County on March 23, 2011.  *Notice of Removal (#1), Exhibit A, Complaint.*  All three Plaintiffs are citizens and residents of Nevada.  It is undisputed that Defendant DePuy

Orthopedics, Inc. is an Indiana corporation whose principal place of business is in Indiana. It is also undisputed that Defendant Precision Instruments, Inc. is a Nevada corporation whose principal place of business is located in Nevada.

Defendant DePuy is the manufacturer of the Depuy ASR Hip device used in total hip replacement surgeries. All three Plaintiffs underwent hip replacement surgeries during which DePuy ASR Hips were implanted. The surgeries were performed by the same surgeon. Following the hip implants, the Plaintiffs allegedly experienced adverse reactions caused by alleged design defects in DePuy ASR Hips. Plaintiffs underwent revision surgeries and have allegedly endured long and painful rehabilitation processes. *Complaint*, ¶¶ 42-70.

The Complaint alleges that DePuy began selling the device nationally in 2005 and touted the advantages of the DePuy ASR Hip, including reduced wear, as compared to traditional hip replacement. *Complaint*, ¶¶ 22, 26-27. Beginning in 2005, however, experts from around the world allegedly warned that the design of the DePuy ASR Hip was flawed. These alleged defects included that the cup and head was too small and could lead to jamming in some patients, that the cup and head was prone to increased wear, and that the DePuy ASR cup was shown to have a 4-fold higher rate of revision than a similar cup in the Australian Joint Registry. ¶¶ 29-33. DePuy allegedly disputed these warnings and continued to heavily promote the ASR Hip for the next four years. ¶ 34. In late 2009, however, DePuy stated that it was phasing out sales of the DePuy ASR Hip, and in early 2010, DePuy sent letters to orthopedic surgeons warning of high failure rates with the device. ¶¶ 39, 40. On August 24, 2010, DePuy allegedly announced that it was recalling the DePuy ASR Hip, and stated in the Recall Notice that reasons for high failure rates included "'component loosening, component malalignment, infection, fracture of the bone, dislocation, metal sensitivity and pain.'" ¶ 41.

Plaintiffs allege that Defendant Precision Instruments served as a distributor for DePuy in Nevada, in promoting, selling, distributing, marketing and servicing the DePuy ASR Hip. *Complaint* ¶¶ 10, 12. Precision's directors, managers and sales representatives allegedly received training and education from DePuy including orthopedic and surgical training, the product design rationale for the DePuy ASR Hip, surgical technique tips for demonstrating and implanting the

DePuy ASR Hip, training in the use of the tools used to implant the DePuy ASR Hip, training in selecting the hip replacement components to mate with the DePuy ASR Hip cup, and training in how to sell the DePuy ASR Hip to orthopedic surgeons. ¶ 14.  Precision's sales representatives were allegedly responsible for educating Plaintiffs' orthopedic surgeon regarding the advantages of the product, answering any questions Plaintiffs' orthopedic surgeon had regarding the product, educating the surgeon in surgical techniques and providing demonstrations on how to implant the DePuy ASR Hip and assisting Plaintiffs' orthopedic surgeon at surgery regarding the product. ¶¶13, 16.  The Complaint alleges causes of action against both DePuy and Precision for negligence, strict product liability, breach of implied and express warranties, deceptive trade practice act violations, deceit, and negligent misrepresentation. ¶¶ 80-214.

Defendants removed the action to federal court on April 22, 2011 based on diversity of citizenship between Plaintiffs and Defendant DePuy. *Notice of Removal (#1)*.  Defendants allege that the citizenship of Defendant Precision should be disregarded because it has been fraudulently joined as a defendant, and Plaintiffs have no cause of action against Precision under the settled law of Nevada.  Defendants attached a declaration by the principal officer of Precision Instruments, Ron Emes, to their Notice of Removal.  *Notice of Removal (#1), Exhibit D, Emes Declaration.*  Mr. Emes states that Precision played no role in the design or manufacture of the DePuy ASR Hip prosthesis or in the regulatory or approval process for the product.  He states that DePuy sells the ASR Hip prosthesis directly to, or places products on consignment, with hospitals that use the hip prosthesis.  Precision does not take title to or have an ownership interest in the DePuy ASR Hip prosthesis, and it is not a party to any sales contracts for the product.  Precision has no role in setting the price for the product and does not receive or make payments in the sales transactions involving the product.  Precision does not provide any warranties for the DePuy ASR Hip prosthesis.  Mr. Emes further states that Precision has no role in the development or publishing of the marketing materials that accompany the product or are disseminated to health care providers.  Precision's role in the distribution of the product to hospitals or surgeons is limited to delivering the specific prosthesis ordered in a sealed package.  Precision retrieves the prostheses from inventory kept at the hospital or at Precision's facility, or by ordering the prosthesis from DePuy

and delivering the sealed sterile package to the hospital upon receipt.  Precision does not inspect or examine the device or components contained therein.

Plaintiffs respond to Mr. Emes' declaration regarding Precision's limited role in the delivery of the DePuy ASR Hip devices by referring to medical records which show that Precision representatives "scrubbed in" and were present during each Plaintiff's surgery.  *Motion to Remand (#5), pages 18-19, Exhibits 13-17*.  They also refer to and attach an internet posting by a former Precision sales representative and current sales representative of DePuy who states that while working for Precision, he "[p]erformed daily sales calls to orthopedic surgeons and related health care professionals offering orthopedic products and discussing clinical outcomes for total joint replacement and joint revision surgery." *Id. page 22, Exhibit 25*.  The sales representative also reportedly "[c]onsulted with surgeons prior to surgery, reviewed implant choices and templated x-rays for proper patient fit and alignment," and "planned, scheduled, delivered, set up implants for surgery." *Id.*  Plaintiffs also cite testimony given by a DePuy representative in an action in the Eastern District of California stating that DePuy's sales representatives are its "primary point of contact with the physicians and hospitals that use DePuy's products," and that they "educate customers about product features, assist customers in understanding the proper use of the products, and often observe surgeries first hand to ensure that the products are being used appropriately." *Id., page 26, Exhibit 31*.

## DISCUSSION

**1.      Defendants' Motion to Stay Pending Transfer to the MDL Court**

On December 3, 2010, the Judicial Panel on Multidistrict Litigation entered a transfer order pursuant to 28 U.S. §1407 assigning MDL No. 2107, *In re: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation* to the Honorable David A. Katz of the Northern District of Ohio.  The Defendants have provided the MDL Panel with notification of this action which conditionally transfers this case to the MDL court.  Defendants state that as of the filing of their motion to stay, in excess of 500 ASR Hip cases have been conditionally transferred to the MDL court.  *Motion to Stay (#6), page 3*.  Plaintiffs have objected to the transfer of this case to the MDL court.  Both parties acknowledge that until a final order transferring this case to the MDL court is

entered, this Court retains jurisdiction and may decide the motion to remand. Defendants request that the Court stay this matter and allow Plaintiffs' motion to remand to be decided by the MDL judge once the order of transfer becomes final. Plaintiffs argue that this Court should decide the jurisdictional issue and remand this case to the Nevada court without further delay.

In *Greene v. Wyeth*, 344 F.Supp.2d 674, 678-9 (D.Nev. 2004), the district court stated:

> The central inquiry in determining whether the jurisdictional issue is more appropriately resolved by the MDL court should be whether deferring to that court would advance the interests for which the statutes authorizing multidistrict litigation were intended: "Section 1407 was intended to promote the 'just and efficient conduct' of the actions transferred [to the MDL court]." *See, e.g. In re Ivy,* 901 F.2d 7 (2d Cir.1990) (citing H.R.Rep. No. 1130, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin. News 1898, 1900). *See also Meyers v. Bayer AG,* 143 F.Supp.2d 1044, 1049 (E.D.Wis.2001) (citing H.R.Rep. No. 90-1190).

The court in *Greene* held that the federal district court in Nevada was best suited to decide the fraudulent joinder and fraudulent misjoinder issues in that case which involved the interpretation of Nevada law. The court stated that there was no evidence that the MDL court had previously considered the issue of Nevada law that was raised by the motion to remand. *Greene*, 344 F.Supp.2d at 679. The court also held that the interest of expediency weighed in favor of the district court in Nevada deciding the motion to remand because it was unknown when the multilitigation panel would issue a conditional transfer order to the MDL court, and that even after that order was issued, the plaintiffs would be entitled to contest the transfer which would result in further delay of a decision on the motion to remand.

Defendants, however, place substantial reliance on Judge Pro's January 11, 2007 oral decision in *Batiz v. Merck & Co.*, Case No. 2:06-cv-1317-PMP-LRL which granted defendants' motion to stay pending transfer to the MDL court. *See Defendant's Reply Brief (#14), Exhibit B, Transcript of Hearing. Batiz* was one of numerous cases involving the allegedly defective drug Vioxx that were filed against the drug's manufacturer Merck and its distributors or sales agents, known as "detailers," in Nevada state court and then removed to the federal district court. The jurisdictional issue was whether the Nevada detailers had been fraudulently joined to defeat federal diversity jurisdiction. The court recognized that there was a potential that judges in the District of

Nevada could reach conflicting decisions on substantially identical fraudulent joinder issues relating to the detailer defendants. The court also recognized that the MDL judge was fully capable of analyzing Nevada law and deciding the fraudulent joinder issue in a uniform and correct manner. The court therefore held that the interest in uniformity weighed in favor of staying the action and allowing the common subject matter jurisdiction issues to be decided by the MDL judge. *Exhibit B*, pages 5-6.

Defendants also argue that stay orders entered in the Vioxx cases such as *Batiz* established a trend in this district that favors staying actions pending their transfer to the MDL court, thereby permitting the MDL court to resolve motions to remand in an orderly and uniform manner. Defendants argue that this trend contrasts with the prior predilection in the "Fen-Phen" drug defect cases, of which *Greene v. Wyeth* is an example, to deny the motions for stay and rule on the motions to remand prior to final transfer to the MDL court. Regardless of whether either group of cases established a trend, the Court finds that the circumstances relating to this case do not justify a finding that the interest in uniformity outweighs the interest in an expeditious determination of subject matter jurisdiction.

Although numerous cases involving the DePuy ASR Hip device have been filed throughout the United States and transferred to the MDL court since the product recall was issued in August 2010, only three such cases have so far been filed in or removed to the District of Nevada. The first case, *Goecke v .DePuy Orthopaedics, Inc.*, Case No. 2:10-cv-02127-JCM-PAL, was filed in federal district court against DePuy Orthopaedics, Inc. No co-defendants were named in that lawsuit and it was subsequently transferred to the MDL court. The second case, *Day v. DePuy Orthopaedics, Inc., et al.*, 2:11-cv-00501-KJD-RJJ, was filed in the Nevada state court and removed to this court on April 4, 2010. The co-defendant in that case is the plaintiff's surgeon, who was also the instant Plaintiffs' implant surgeon. The plaintiff in *Day* has filed a motion to remand. The defendants oppose that motion on the grounds that the surgeon has been fraudulently joined. Precision Instruments is not a defendant in the *Day* case.

Because of the factual differences between this case and *Day*, the possibility for inconsistent jurisdictional decisions in these two cases is relatively minor. Furthermore, as

discussed in the next section, this Court follows Judge Dawson's reasoning in *Moore v. Medtronic, Inc.*, 2006 WL 1795861 (D.Nev. June 28, 2006), concerning an exclusive sales representative's potential strict liability under Nevada law. Judge Dawson is also the district judge in the *Day* case which makes the possibility of inconsistent decisions appear even more remote. Although additional ASR Hip cases may hereafter be removed to this court, the District of Nevada is not presently faced with several ASR Hip cases involving the same fraudulent joinder issue. The decision in this case may also provide guidance if additional ASR Hip defect lawsuits against DePuy and Precision are removed to this Court.

Decisions from other districts in cases brought against DePuy and its distributors for alleged design defects in the ASR Hip device, as reported in the Westlaw and Lexis legal databases, have also resulted in denial of the defendants' motions to stay. The courts, instead, have decided the motions to remand based on whether the defendant product distributors or sales representatives are potentially liable under governing state law. *See Kopitke v. DePuy Orthopaedics, Inc., et al.*, 2011 WL 856865, 2011 U.S. Dist. LEXIS 23869, (N.D.Ill. March 8, 2011); *Askew v. DC Medical, LLC and DePuy Orthopaedics, Inc.*, 2011 WL 1811433, 2011 U.S. Dist. LEXIS 50817 (N.D.Ga. May 12, 2011); and *Malkmus v. DePuy Orthopaedics, Inc., et al.*, 2011 WL 2436172, 2011 U.S. Dist. LEXIS 634202 (E.D.Wis. June 13, 2011). In words echoing *Greene v. Wyeth*, the court in *Malkmus v. DePuy Orthopaedics, Inc., et al.*, states:

> Although raising the issue of fraudulent joinder might be common in similar actions related to this allegedly defective artificial hip, the resolution of the pending motion for remand depends distinctly upon an interpretation of Wisconsin law. A district court in Wisconsin is generally better equipped to address questions of Wisconsin law than a court in Ohio and as such, the court concludes that conditionally transferring this case to the MDL court would likely result in an unnecessary delay of the plaintiffs' case without leading to a more efficient resolution of the pending motion. One way or another, a federal court is going to have to consider Wisconsin law and decide how it applies to the plaintiffs' case; in the view of this court, it makes the most sense for that burden to be borne by this court rather than kicking the can down the road.

*Malkmus,* 2011 WL 2436172 at *2.

Based on all of the circumstances, the Court finds that the interest in an expeditious determination of federal subject matter jurisdiction in this case outweighs any potential danger of

inconsistent jurisdictional decisions in this district which, as stated above, is fairly remote. Although decisions from other jurisdictions demonstrate that the fraudulent joinder issue in this case is not unique to Nevada, resolution of the issue depends on the court's interpretation of Nevada law which a district court in Nevada is generally better equipped to address than the MDL court in Ohio. Accordingly, the Court denies Defendants' motion to stay.

### 2. Plaintiffs' Motion to Remand

"Any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). The party seeking to invoke federal jurisdiction bears the burden of establishing jurisdiction. *Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir.1990). The fraudulent joinder of a nondiverse defendant does not defeat otherwise proper diversity jurisdiction. Fraudulent joinder is a term of art and does not require a showing of bad faith or unethical conduct by plaintiff. "If a plaintiff fails to state a cause of action against the defendant, and the failure is obvious according to the settled rules of the state, the joinder of the resident defendant is fraudulent." *McCabe v. General Foods Corp.,* 811 F.2d 1336, 1339 (9th Cir.1987). When fraudulent joinder is an issue, the defendant seeking removal is entitled to present facts showing that "the individuals joined in the action cannot be liable on any theory." *Ritchey v. Upjohn Drug Co.,* 139 F.3d 1313, 1318 (9th Cir.1998), cert. denied, 525 U.S. 963, 119 S.Ct. 407, 142 L.Ed.2d 330 (1998). The court may pierce the pleadings and consider summary judgment-type evidence such as affidavits and deposition testimony. *Morris v. Princess Cruise, Inc.*, 236 F.3d 1061, 1068 (9th Cir. 2001).

In *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3rd Cir. 1992), the Third Circuit stated that the removing party carries a heavy burden of persuasion to demonstrate that the resident defendant was fraudulently joined. The removing defendant should have this burden because the removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand. District court decisions in this district have relied on *Batoff. See King v. Warner-Lambert Co.*, 2002 WL 988167, at *1 (D.Nev. 2002) and *Grabez v. Wal-Mart Stores, Inc.*,

2010 WL 4873266, at *2 (D.Nev. 2010). *Batoff* further states:

> [I]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court. . . . [W]here there are colorable claims or defenses asserted against or by diverse and non-diverse defendants alike, the court may not find that the non-diverse parties were fraudulently joined based on its view of the merits of those claims or defenses.

*Id.* 977 F.2d at 851-852. (internal quotation marks and citations omitted).

*Batoff* further stated that the court "must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff." *Id.* at 852. *See also Moore v. Medtronic, Inc.*, 2006 WL 1795861, at *2 (D.Nev. June 28, 2006), citing *Dodson v. Spiliada Mar. Corp.*, 951 F.2d 40, 42 (5th Cir. 1992) (holding that disputed questions of fact and all ambiguities in state law must be resolved in favor of the plaintiff).

The determination of whether Defendant Precision Instruments, Inc. has been fraudulently joined as a defendant in this action depends initially on whether it potentially qualifies as a "seller" or "distributor" of a product within the meaning of Nevada's strict product liability law. Three unpublished decisions in this district have dealt with the issue of whether a resident sales representative for a medical device manufacturer is potentially a seller of a product under Nevada law. *See Moore v. Medtronic, Inc.*, 2006 WL 1795861 (D.Nev. June 28, 2006)*; Kite v. Zimmer US, Inc.*, 2006 WL 3386765 (D.Nev. November 22, 2006); and *Thompson v. Medtronic, Inc.*, 2006 WL 3544937 (D.Nev. December 8, 2006).

In *Moore v. Medtronic, Inc.*, the plaintiff sued Medtronic, the manufacturer of an allegedly defective catheter device that was used in her surgery. The plaintiff also sued Petroni, a Nevada resident, who worked for Medtronic as a "Therapy Consultant." In preparation for the surgery, the surgeon contacted Petroni to request that a pump and catheter be ordered for the surgery. The catheter was taken from the manufacturer's "trunk stock" which consisted of Medtronic devices that Petroni stored at his office or residence so that they could be readily available for a surgeon's use. Petroni, however, did not arrange the purchase order and invoice for the catheter at issue. That paperwork was handled by another independent contractor for Medtronic who was not named

in the lawsuit. The defendants removed the action to federal court and plaintiff subsequently filed a motion to remand based on the lack of diversity between plaintiff and defendant Petroni. The defendants argued, however, that Petroni was fraudulently joined and that the motion to remand should be denied.

The court, by Judge Dawson, stated that "[u]nder the law of strict liability in [Nevada], responsibility for injuries caused by defective products is properly fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market. Although manufacturers are not insurers of their products, where injury is caused by a defective product, responsibility is placed upon the manufacturer and the distributor for the defective product rather than on the injured consumer." *Moore v. Medtronic, Inc.*, at *2, quoting *Allison v. Merck & Co.*, 878 P.2d 948, 110 Nev. 762, 767-68 (1994). The court further noted that the Nevada Supreme Court has relied on the Restatement (Second) of Torts Section 402A in addressing strict product liability under Nevada law. *Id.* citing *Allison*, 878 P.2d at 953-58, 110 Nev. at 769-76 (addressing the application of comment k to section 402A); and *Ellery v. Stephens*, 760 P.2d 768, 771-72, 104 Nev. 413, 417-18 n. 3 (citing comment f to section 402A). Although these cases predated the publication of the Restatement (Third) of Torts, *Moore* recognized that the Nevada Supreme Court regularly relies on the restatement of torts in addressing strict product liability claims. *Id.*

*Moore* nevertheless stated that "there is a dearth of case law in Nevada state courts defining what a 'seller' is for purposes of strict products liability." *Id.* at *2. Although *Allison* held that the defendant county health district was not a seller of a vaccine product that it administered to a child, *Moore* noted that the Nevada Supreme Court provided no reasoning for its decision. *Id.* at *2 n. 3. *Moore* further stated that Nevada courts have not addressed whether a sales representative for a manufacturer can be considered a "seller" for purposes of liability under a strict product liability theory. The court noted that other jurisdictions are split on the issue. *Id.* at *2 n. 4, citing *Memphis Bank & Trust Co. v. Water Serv. Inc.*, 758 S.W.2d 525 (Tenn. 1998) (holding that a sales representative is not subject to strict products liability) versus *Bitter v. White & Co., Inc.*, 560 N.E.2d 979, 203 Ill.App.3d 26 (1990) (finding that participatory connection with defective product

was sufficient to subject the exclusive sales representative to strict product liability) and *Brumbaugh v. CEJJ, Inc.*, 547 N.Y.S.2d 699, 152 A.D.2d 69 (1989) (finding exclusive sales agent subject to strict product liability because he was a mandatory link in the distribution chain).[1]

In granting plaintiff's motion to remand, *Moore* stated:

> As explained previously, it is unclear as a matter of state law whether a sales representative like Petroni is or is not a "seller of products" under a theory of strict products liability. This Court can not (but more importantly will not) predict how the state courts would define a "seller" for purposes of strict liability given their silence so far on this issue. Moreover, if Petroni's position would be considered a "seller" for purposes of strict products liability, when viewing the evidence in the light most favorable to the Plaintiffs, one could find that Defendant Petroni was a sufficient link in the chain of distribution. What role, if any, Defendant Petroni played in procuring the product for Plaintiff's surgery should be determined by the trier of fact.
>
> . . . The Court is instructed to remand a case unless there is absolutely no possibility that the plaintiff will be able to establish a cause of action against the in-state defendant in state court. Defendants have not met their heavy burden concerning the alleged fraudulent joinder of Defendant Petroni. Because Plaintiff has a "colorable" state law claim against Defendant Petroni, this Court must grant Plaintiff's motion to remand.

*Moore* at *3.

In *Kite v. Zimmer US, Inc.*, 2006 WL 3386765 (D.Nev. November 22, 2006), the plaintiff sued the manufacturer of an artificial hip device and the manufacturer's Nevada sales representative. Although there was a presumption that the device at issue had been delivered by the manufacturer's Nevada sales representative, the only evidence submitted by plaintiffs connecting the sales representative to the device was a phone conversation between plaintiffs' counsel and an unidentified employee of the defendant sales representative who allegedly confirmed that it was the manufacturer's distributor for the hospital where plaintiff's surgery was performed. The defendant sales representative rebutted this evidence with an affidavit by its officer who stated that the defendant did not facilitate the delivery of any devices in Las Vegas beyond a certain date that was long before the plaintiff's surgery.

---

[1] These cases are cited in the Reporters' Note *g* to the Restatement (Third) of Torts § 20, Definition of "One Who Sells Or Otherwise Distributes."

11

In denying the plaintiff's motion to remand, Judge Jones cited his earlier decision in *Baker v. Merck & Co. Inc.*, Case No. CV-S-05-0625, Order (D.Nev. September 12, 2005), in which he stated that "[i]f there is an 'absence of a sufficient causal nexus between' the plaintiff's claims and the alleged conduct of the defendant, the causes of action will fail and joinder will be improper." *Kite*, 2006 WL 3386764, at 2. The plaintiff in *Baker* alleged that defendants (drug sales representatives) supplied the drug Vioxx to the plaintiffs' physicians. The court found, however, that two of the plaintiffs received Vioxx from their physicians in California, an area not covered by the defendant sales representatives. Because no causal nexus existed, the court found no colorable claim against the defendant sales representatives as to the two plaintiffs. Likewise, the evidence in *Kite* showed "an absence of casual nexus between Plaintiffs' claims and the alleged conduct of Zimmer Frey [the sales representative]." Therefore, plaintiffs did not have a colorable claim against the defendant and the motion to remand was denied.

*Kite* also appeared to adopt a fairly narrow construction of the term "seller" under Nevada product liability law. Unlike Judge Dawson in *Moore*, Judge Jones relied on the Nevada Supreme Court's holding in *Allison v. Merck & Co.* that the county health department was not a "seller of products." The court also cited the Nevada Uniform Commercial Code which states that "'[a] 'seller' is a person who sells or contracts to sell goods.' Nev.Rev.Stat. § 104.2103." The court further relied on the affidavit of the defendant sales representative which averred that it (1) served only as a conduit through which hospitals and surgeons could request and receive medical devices, (2) that it never bought, resold or took title to medical devices, (3) that it never opened, modified or altered the medical devices it delivered, and (4) that it was never responsible for billing or payment for the devices. The court held that this evidence demonstrated that defendant was merely a service provider. The court did not discuss *Moore v. Medtronic, Inc.* or decisions such as *Bitter v. White & Co., Inc.*, 560 N.E.2d 979, 203 Ill.App.3d 26 (1990) and *Brumbaugh v. CEJJ, Inc.*, 547 N.Y.S.2d 699, 152 A.D.2d 69 (1989) which have extended strict product liability to exclusive sales representatives for a product manufacturer or supplier.

*Thompson v. Medtronic, Inc.*, 2006 WL 3544937 (D.Nev. December 8, 2006), was also decided by Judge Jones. In this case, the plaintiff's physician recommended that he purchase an

insulin pump and referred him to Medtronic/Mini-Med's sales representative, Baxter, who sold plaintiff the insulin pump. The insulin pump required the use of disposable tubing known as infusion sets that connected the pump to a needle inserted into plaintiff's body. Baxter provided plaintiff with Mini-Med's 800 telephone number so that he could order the infusion sets directly from the manufacturer or supplier. Baxter was on disability leave during the time in which Mini-Med sold a new type of infusion set, called "Quick-set," to plaintiff. Mini-Med stopped selling the Quick-set infusion set prior to Baxter's return. The plaintiff later filed a bodily injury lawsuit against the manufacturer and Baxter in state court based on alleged defects in the Quick-set infusion sets.

The court in *Thompson* discussed the statement in *Moore v. Medtronic, Inc.* "that Nevada case law does not specifically address whether a sales representative for a manufacturer may be a 'seller' for purposes of strict product liability." *Thompson,* 2006 WL 3544937, at *2. The court, however, distinguished *Moore* on the grounds that there was not a "sufficient causal nexus" between the plaintiff's claims and the alleged conduct of the sales representative, Baxter. The court stated that it could not consider Baxter a "seller of products" because the plaintiff purchased the allegedly defective products, the infusion sets, directly from Mini-Med. Baxter's role in setting up a "course of sales" did not expose him to liability because he merely gave plaintiff Mini-Med's telephone number to order more infusion sets as needed. The court also found that a sufficient causal nexus was lacking because Baxter was on disability during the entire period that the Quick-set infusion sets were commercially available and, therefore "Baxter did not take part in the design, manufacture, marketing, promotion, sale or distribution of the infusion sets." *Id.* at *3.

Decisions from other federal districts involving claims against medical device manufacturers' sales representatives are consistent with *Moore v. Medtronic.* In *Cooper v. Zimmer Holdings, Inc.*, 320 F.Supp.2d 1154 (D.Kan. 2004), the district court granted plaintiff's motion to remand an action brought against Zimmer and its resident sales representative, Zimmer Maxon. The district court first analyzed whether Zimmer Maxon could be considered a "product seller" under the Kansas Product Liability Act ("KPLA") which imposes certain limits on strict product liability otherwise arising under the Restatement (Second) of Torts § 402A which had been

adopted by the Kansas courts. The district court stated that Kansas courts could give an expansive meaning to the term "product seller" as used in the KPLA to further its purpose of providing broad protection against certain product liability claims. In regard to whether Zimmer Maxon could be found to be a "seller" within the meaning of § 402A, the court quoted the language of that section as follows:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or his property, if (a) *the seller is engaged in the business of selling such a product,* and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Cooper*, 320 F.Supp.2d at 1159-60.

The court noted that the comments to § 402A explain that the rule 'applies to any person engaged in the business of selling products for use or consumption." *Id.* 320 F.Supp.2d at 1160. "As such, the rule 'therefore applies to any manufacturer of such product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant.' In contrast, '[t]he rule does not apply to the occasional seller who is not engaged in that activity as part of his business." *Id.*

The defendants argued that a "sales broker" such as Zimmer Maxon is not engaged in the business of selling a product. The defendants relied on the Seventh Circuit decision in *Geboy v. TRL, Inc.*, 159 F.3d 993 (7th Cir. 1998) which adopted a three factor test to determine whether a defendant who sold a used industrial machine was engaged in "the business of selling." The court considered (1) whether the defendant had any direct relationship with either the manufacturer or distributor through which information could be exchanged on possible dangerous defects; (2) whether any representation as to the safety of the product was discussed or implied in its sale; and (3) whether the seller/dealer had the ability to identify any potential risk and reduce that risk. *Geboy* stated that these factors were relevant because "'[o]ne justification for strict liability suggests that the seller, by marketing his product whether new or used, has assumed a special responsibility toward any subsequent purchaser who relies on the seller's representation that the product is safe.'" *Cooper*, 320 F.Supp.2d at 1161. Although the Seventh Circuit stated that "[a] broker of used products does not necessarily assume that responsibility," *Id.*, the district court in

*Cooper* stated that a Kansas court might conclude that Zimmer Maxon was engaged in the business of selling under the *Geboy* test. The court explained:

> According to the plaintiffs' evidence offered in support of their motion to remand, Zimmer Maxon was more than a mere conduit between a buyer and a seller. Zimmer Maxon, according to plaintiffs' evidence, is a sales organization that deals exclusively with Zimmer products. It is not permitted to deal in other products. Zimmer Maxon sales associates demonstrated the orthopedic devices to surgeons, provided them with information about surgical techniques, and answered questions about the products. In his deposition, Steven D. Maxon admitted that prior to the date of Mr. Cooper's surgery, Zimmer provided him with reprints of scientific studies ("white sheets") that addressed the possibility of delamination of Ultrahigh Molecular Weight Polyethylene components. Mr. Maxon further testified that upon request or when he needed to address a specific concern, his company would provide surgeons with copies of these white sheets. Thus, it is not beyond the realm of possibility that a Kansas court would find that unlike the facts in *Geboy*, here, Zimmer Maxon: (1) had a direct relationship with the manufacturer through which information concerning dangerous defects could be shared; and (2) that Zimmer/Maxon had the ability to identify any potential risk and to reduce that risk. If so, the court could find that Zimmer Maxon owed a duty to plaintiff based on the factors set forth in *Geboy*.

*Cooper*, 320 F.Supp.2d at 1161.

In *Malkmus v. DePuy Orthopaedics Inc.*, 2011 WL 2436172 (E.D.Wis. June 13, 2011), the court noted that Wisconsin courts apply the *Geboy* test and that a product distributor may potentially be found strictly liable for defective designs in the product. In holding that the defendant distributor, TRP, was not fraudulently joined in a case involving the ASR Hip device, the court relied on the plaintiff's allegations that TRP was DePuy's exclusive distributor in Wisconsin, that TRP failed to disclose that the product was prone to significant problems, that TRP delivered the product in a sealed package to plaintiff's surgeon, and that TRP's sales representative was present during both of plaintiff's surgeries. *Id.* at *3.

In *Spataro v. DePuy Orthopaedics, Inc. et al.*, 2009 WL 382617 (D.N.M. 2009), the district court granted a motion to remand an action regarding an allegedly defective knee implant device brought against DePuy Orthopaedics and its independent contractor sales representative Dillard. The plaintiff alleged that Dillard was strictly liable because she distributed or supplied the prosthesis used in his surgery and was present during and/or after his surgery. Dillard

15

acknowledged that she may have delivered the device used in plaintiff's surgery and may been present during the surgery. She stated, however, that she did not purchase or acquire title to any prosthetic implant products and indicated that her role was limited to simply providing the appropriate device to be selected by the surgeon or medical staff for use during the surgery. DePuy's customer service manager also testified that DePuy's independent sales representatives do not design or manufacture the products, or purchase the products from DePuy and then sell, distribute or supply them to doctors, hospitals or others. In holding that defendants had not met their burden to show that Dillard was fraudulently joined, the district court noted that the New Mexico court in *Parker v. St. Vincent Hospital*, 122 N.M. 39, 919 P.2d 1104 (Ct.App.1996), recognized that a hospital, which supplied joint replacement devices ordered by a physician, was a distributor of the devices. The New Mexico court held on policy grounds, however, that a hospital should not be strictly liable for alleged design defects in the devices. In light of this decision, district court stated:

> While it is not entirely clear whether Spataro could establish a strict liability cause of action against Dillard in state court, this Court cannot conclude that there is no possibility of this. This Court acknowledges that a New Mexico court, in the future, may decide that a sales representative like Dillard cannot be held strictly liable for a defective medical device. However, for this Court to decide that question, which New Mexico's appellate courts have not decided, on a motion to remand, would require that it engage in the multi-part policy analysis that the state courts utilized in deciding *Parker v. St. Vincent Hospital* and *Tanuz v. Carlberg*. This is exactly the sort of "intricate analysis of state law" that counsels a finding that Spataro's claims against Dillard are "not so wholly insubstantial and frivolous that [they] may be disregarded for purposes of diversity jurisdiction." *Batoff v. State Farm Ins. Co.,* 977 F.2d at 853 (quoted in *Montano v. Allstate Indem.,* 2000 WL 525592 at *2). Accordingly, the Court finds that DePuy and Dillard have failed to meet their burden of showing that Dillard is fraudulently joined in this action.

*Spataro*, 2009 WL 382617, at *8.

Federal district courts in California have also granted motions to remand product liability actions brought against resident independent sales representatives of medical device manufacturers/suppliers on the grounds that the sales representatives may potentially be liable under California strict product liability law for defectively designed products whose sales they

16

facilitate. *See McCarty v. Johnson & Johnson, et al.*, 2010 WL 26229913 (E.D.Cal. 2010) (involving claims against a *DePuy* manufacturing entity and its independent sales representative) and *Hinds v. Zimmer, Inc.*, 2009 WL 151793 (E.D.Cal. 2009).

In contrast to these cases, the district court in *Askew v. DC Medical, LLC*, 2011 WL 1811433 (N.D.Ga. May 12, 2011), held that Depuy's sole distributor of the ASR hip device in Georgia was fraudulently joined. Although not discussed in *Askew*, Georgia's strict product liability statute imposes liability only on the manufacturer of a product. A seller or distributor is not strictly liable. *See Davenport v. Cummins Alabama, Inc.*, 284 Ga.App. 666, 644 S.E.2d 503, 507-08 (Ga.App. 2007) (citing several Georgia decisions). Although a distributor can be held liable for negligent failure to warn if it had actual or constructive knowledge of the defect, the plaintiff failed to produce any evidence to rebut the distributor's declaration that it had no actual or constructive knowledge of the defect.

The decisions in *Kite v. Zimmer, Inc.* and *Thompson v. Medtronic, Inc.* rest, in part, on the view that a manufacturer's sales representative is a not a "seller" within the meaning of Nevada's strict product liability law. *Moore v. Medtronic, Inc.*, however, holds that Nevada law on this issue is unsettled. *Moore* is consistent with the decisions from other districts in which the controlling state law is either unclear or arguably permits the imposition of strict liability on manufacturer's sales representatives. More importantly, *Moore* is consistent with the federal law of removal that any ambiguities in controlling state law should be resolved in plaintiff's favor and therefore in favor of remand. Because it is possible that the Nevada Supreme Court will hold that a manufacturer's exclusive sales representative is strictly liable for design defects based on the type of conduct alleged in this case, Precision Instruments has not been fraudulently joined so long as there is a causal nexus between its alleged conduct and Plaintiffs' injuries.

Plaintiffs allege that Precision "sold" and delivered the DePuy ASR Hip devices that were implanted in each of the Plaintiffs. *Complaint,* ¶¶ 12, 73. Plaintiffs also allege that Precision was responsible for educating Plaintiffs' surgeon regarding the DePuy ASR Hip, answering any questions the surgeon had about the device and convincing Plaintiffs' surgeon to purchase or use the device. *Id.* ¶¶ 13, 74. Although Precision denies that it sold or ever possessed title to the

17

DePuy ASR Hip, it does not dispute that it delivered the prostheses to the Plaintiffs' surgeon, either by retrieving them from inventory maintained at the hospital or at Precision's facility, or by ordering the prostheses from DePuy. *Emes' Declaration*, ¶ 7.  Nor does Precision refute Plaintiffs' allegations that Precision's sales representatives provided education to Plaintiffs' surgeon about the DePuy ASR Hip devices and answered the physician's questions about the devices.  Plaintiffs also assert that Precision sales representatives actually attended Plaintiffs' surgeries[2] which provides further evidentiary support that Precision had direct involvement in promoting and facilitating the sale or use of the DePuy ASR Hip devices that were implanted in the Plaintiffs. These factual allegations distinguish this case from *Kite* and *Thompson*.  As the district court in *Cooper*, 320 F.Supp.2d at 1161, indicated, these are the type of facts upon which the state court could find that a medical device sales representative such as Precision is strictly liable for product design defects that cause injury to the patients.

## **CONCLUSION**

The just and efficient conduct of this action will not be served staying this action so that the MDL court may decide the jurisdictional issue.  Defendants have failed to meet their heavy burden to show that there is no possibility under Nevada law that Defendant Precision Instruments could be held liable to Plaintiffs.  Defendant Precision Instruments therefore has not been fraudulently joined as a Defendant in this lawsuit.  Because there is a lack of complete diversity of citizenship between the Plaintiffs and Defendants, this action should be remanded to the Nevada state district court.  Accordingly,

**IT IS HEREBY ORDERED** that Defendants DePuy Orthopedics, Inc. and Precision Instruments, Inc.'s Motion to Stay Pending Transfer to MDL No. 2197 - *In Re DePuy Orthopedics, Inc., ASR Hip Implant Products Liability Litigation* (#6) is **denied**; and

. . .

. . .

---

[2] The evidence cited in Plaintiffs' motion to remand does not constitute a new allegation. Instead, it simply provides support for Plaintiffs' allegations that Precision's sales representatives assisted Plaintiffs' surgeon at surgery.  *See Complaint*, ¶13.

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that Plaintiffs' Motion for Remand (#5) be **granted**.

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 6th day of July, 2011.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge